UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:                                              Case No. 09-47467

THOMAS JULIAN JOSEPH, and                           Chapter 7
ANNA MARIE JOSEPH,
                                                    Judge Thomas J. Tucker
                    Debtors.
_____/

**OPINION REGARDING DEBTORS' MOTION TO ENFORCE TERMS OF
DECEMBER 21, 2010 ORDER AND FOR COSTS**

The Chapter 7 Trustee in this case sold the Debtors' home.  Before Debtors moved out,

they removed several items, including window blinds, drapes, a refrigerator, a dishwasher, a

doorbell, and a mailbox.  The Court must decide whether the missing items were fixtures under

Michigan law, and therefore part of the real estate that the Trustee sold, or whether they were

exempt personal property that the Debtors had a right to remove.  In this opinion, the Court

concludes that some items were fixtures and some were not.

This issue arises from a motion entitled "Debtors' Motion to Enforce Terms of December

21, 2010 Order and For Costs" (Docket # 118, the "Motion").  The Court held hearings on the

Motion on March 2 and April 20, 2011.  For the reasons stated in this opinion, the Court will

deny the Motion.

**I.  Background**

**A.  Proceedings leading to the Chapter 7 Trustee's sale of Debtors' home**

The movants, Thomas Joseph and Ann Joseph, are the Debtors in this Chapter 7 case.

The Debtors filed this case originally under Chapter 13, on March 13, 2009.  A few months later,

on July 15, 2009, the Debtors voluntarily converted the case to Chapter 7.  When they filed this

case, the Debtors owned and lived in the home located at 191 Baldwin Road, Birmingham, Michigan. The home was encumbered by a mortgage held by Fifth Third Bank. After obtaining relief from stay on August 18, 2009, Fifth Third Bank eventually sold the home at a foreclosure sale, on October 12, 2010.

With the help of a real estate broker, the Chapter 7 Trustee, K. Jin Lim, marketed the Debtors' home, and was able to take advantage of the six-month redemption period under the Michigan foreclosure statute, by finding a buyer for the Debtors' home. On November 23, 2010, the Trustee filed a motion seeking authority to redeem and sell the property to Harry and Jennifer Gruits (the "Sale Motion").[1] Attached to the Sale Motion was a proposed purchase agreement signed by the Gruits, entitled "Offer to Purchase Real Estate" (the "Purchase Agreement"). The Sale Motion sought authority to sell the property to the Gruits for $424,900.00, "[f]ailing higher offers," "free and clear of liens and interests," and "according to the terms set forth" in the Purchase Agreement.[2]

The Purchase Agreement included a provision that sale of the 191 Baldwin property was to include, among other things, all "built-in appliances; . . . window shades, shutters, blinds, curtains and drapery rods, and all window treatments, . . . and mailboxes, if any[,]" but not "free standing appliances."[3] The Purchase Agreement was signed by the Gruits, but it appears that at least as of the time of the Sale Motion, it was not signed by the Trustee.[4] There is some evidence

---

[1] Docket # 106.

[2] *Id.* at 2, *see also id.* at 3 (proposed order), Ex. A.

[3] Docket # 106, Ex. A at 1.

[4] *Id.*; *see also* Docket # 128, Ex. A.

in the record that the Trustee signed the Purchase Agreement,[5] but there is no copy of the Purchase Agreement in the record showing a Trustee signature. It is undisputed that the Debtors never signed the Purchase Agreement.

Objections to the Sale Motion were filed by Fifth Third Bank; PNC Bank, N.A.; and the Debtors.[6] The Debtors objected on a number of grounds, but did not object to any of the specific terms of the Purchase Agreement other than the price, which they argued was too low.[7]

The Debtors also objected on grounds relating to their exemptions. They argued that the Sale Motion improperly failed to provide for the payment, from the proceeds of the sale, of the Debtors' claimed exemptions in the property.[8] In their most recent amended claim of exemptions, Debtors had each claimed an exemption in the property, "and any proceeds thereof such as redemption rights," under 11 U.S.C. § 522(d)(1). These claimed exemptions totaled $33,974.00.[9] The Trustee had objected to Debtors' exemptions, arguing that Debtors' claimed exemptions should be "deemed satisfied" because the Debtors owed the bankruptcy estate unpaid rent for their occupancy of the property, and such unpaid rent exceeded the amount of the claimed exemption.[10]

The Court held a hearing on the Sale Motion, and on the Trustee's objection to

---

[5] Decl. of Harry Gruits (Docket # 149, Ex. D) at ¶ 2 ("This purchase agreement was countersigned by the trustee handling the bankruptcy.").

[6] Docket ## 112, 113, 114.

[7] Docket # 114.

[8] *Id.* at 5-6.

[9] Docket # 93 at 5, 6.

[10] Docket # 104.

exemptions, on December 20, 2010. At that time, the Trustee's counsel announced that the Trustee's objection to exemptions, and all of the objections to the Sale Motion, had been resolved by agreement. Among other things, the agreement increased the purchase price to be paid by the Gruits. The Trustee filed a stipulation signed by counsel for the parties, including counsel for the Debtors, stipulating to the entry of an agreed order.[11]

**B. The December 21, 2010 sale order**

The Court entered the agreed order on December 21, 2010 (the "Sale Order").[12] The Sale Order did not mention the Purchase Agreement that had been attached to the Sale Motion. The Sale Order stated, in pertinent part:

> **IT IS ORDERED** that:
>
> 1. **The Trustee may redeem and convey the residence at 191 Baldwin Road, Birmingham, Michigan**, to Jennifer Gruits and Harry Gruits for the sum of $430,000.00 free and clear of all liens and interests including, but not limited to, the liens of Fifth Third Bank, PNC Bank and the Internal Revenue Service and the interests of the Debtors. Closing shall take place not later than December 30, 2010.
> . . .
>
> 3. **Debtors shall vacate and surrender possession of the premises not later than January 7, 2011.** Debtors shall cooperate in a pre-closing inspection of the premises.
>
> 4. **$25,000.00 of the sale proceeds shall be remitted to the Debtors in full satisfaction of any available exemptions** under 11 U.S.C. §522(d)(1) and (d)(5) and no further amendments of exemptions based on these sections shall be allowed.
>
> 5. **The payment to Debtors shall be made within three (3)**

---

[11] Docket # 115.

[12] Docket # 116.

4

**business days following the Debtors' timely surrender of the premises in good order** and purchasers' final inspection which final inspection shall take place within twenty-four (24) hours of the Debtors' surrender of the premises. This order resolves the Trustee's Objections to Exemptions (Docket # 104), including any claim for rent. **After closing, Debtors' exemption shall be held in escrow pending their surrender of the premises and the purchasers' final inspection.**

6. Debtors shall not be charged with any amounts for their use of the premises through January 7, 2011. **The Debtors' exemption shall be paid free and clear of any claim or offset by the Trustee or any other party.**[13]

## C.  Proceedings after the sale closing

The sale closed, and the Trustee redeemed the property from the foreclosure sale, and conveyed the property to the Gruits. As required by the Sale Order, the Trustee held $25,000.00 of the sale proceeds, pending Debtors' "surrender of the premises in good order" by the January 7, 2011 deadline. Everyone agrees that the Debtors moved out of the property by the January 7 deadline. A dispute has arisen, however, as to whether the Debtors surrendered the premises "in good order," as required by the Sale Order.

## D.  The present dispute

On January 27, 2011, the Trustee filed an adversary proceeding, No. 11-4461, against the Debtors and the Gruits, in the nature of an interpleader action. The Trustee alleged that she has withheld payment of the $25,000.00 exemption amount to the Debtors because the Debtors "did not surrender the premises in good order" as required by the Sale Order.[14] According to the Trustee, when the Debtors moved from the premises, they removed a number of items that "were

---

[13]  *Id.* at 1-2 (emphasis added).

[14]  Compl. (Docket # 1 in Adv. Pro. No. 11-4461) at ¶ 8.

to have remained" with the premises under the Purchase Agreement, namely, "window blinds, window drapes and hardware, a built-in refrigerator, woodmade refrigerator door panels, a built-in dishwasher, an exterior garden bell and a wall mounted copper mailbox."[15]

The Debtors and the Gruits filed answers to the Trustee's complaint, and make competing claims to the $25,000.00 that the Trustee is holding.[16]

The same day the Trustee filed her adversary proceeding, the Debtors filed the Motion which is the subject of this opinion, in the main case. In the Motion, the Debtors allege that they did surrender the premises "in good order," and that the Trustee has improperly refused to pay them the $25,000.00 as required by the Sale Order. Debtors do not dispute that they removed and took the items in question when they moved from the premises. But they contend that they had a right to take these items. Debtors seek an order requiring the Trustee to pay them the $25,000.00.[17]

The Gruits and the Trustee each filed objections to the Debtors' Motion.[18] The Gruits attached to their objection a list of the items that the Debtors removed, and that the Gruits say were part of what the Trustee sold to them when he sold them the real estate. The items at issue, which Debtors admit having taken, are these:

- window blinds
- window drapes and hardware
- refrigerator
- refrigerator door panels

---

[15] *Id.* at ¶¶ 8, 9.

[16] Docket ## 4, 7 in Adv. Pro. No. 11-4461.

[17] Docket # 118.

[18] Docket ## 128, 131.

6

- Electrolux dishwasher
- exterior garden bell
- wall mounted copper mailbox[19]

The Gruits claim that the cost to replace these items is at least $16,650.00.

The Court held hearings on the Motion on March 2 and April 20, 2011. The Motion is now ready for decision.

## II. Jurisdiction

This Court has subject matter jurisdiction over this contested matter under 28 U.S.C. §§ 1334(b), 157(a) and 157(b)(1), and Local Rule 83.50(a) (E.D. Mich.). This is a core proceeding under the following subparts of 28 U.S.C. § 157(b)(2): (A), (B), (N), and (O).

## III. Discussion

### A. The meaning of the Sale Order

The Sale Order, quoted above, gave the Trustee authority to sell "the residence at 191 Baldwin Road, Birmingham, Michigan" to the Gruits. The Sale Order required the Debtors to "vacate and surrender possession of the premises not later than January 7, 2011." And the Sale Order stated that the $25,000.00 from the sale proceeds that the Trustee was to pay to the Debtors was to be paid "within three (3) business days following the Debtors' timely surrender of the premises in good order . . .."[20] As used in the Sale Order, the terms "the residence," and "the premises" clearly mean the same thing — namely, the real property located at 191 Baldwin Road, Birmingham, Michigan. Debtors' counsel acknowledged this during the March 2 hearing.[21] And

---

[19] Docket # 128 at 2, Ex. B.

[20] Sale Order (Docket # 116) at ¶¶ 1, 3, 5.

[21] Tr. of March 2, 2011 hearing (Docket # 138) at 9-10.

7

it is clear that the Sale Order authorized the Trustee to sell to the Gruits only the *real* property, not any *personal* property.

## B. The "fixture" issue

The Gruits contend, among other things, that all of the missing items were fixtures under Michigan law, and therefore were part of the real property that the Trustee sold to them under the authority of the Sale Order. The Debtors disagree, and argue that none of these items were fixtures. Rather, Debtors say, they were items of personal property, and as such, they were not authorized to be sold, and were not sold, by the Trustee to the Gruits under the Sale Order. Instead, Debtors argue, these items are all exempt personal property owned by the Debtors.[22]

In resolving this issue, the Court must look to applicable state law, which in this case is Michigan law. *See generally Butner v. United States*, 440 U.S. 48, 54-55 (1979); *accord French v. Frey (In re Bergman)*, 467 F.3d 536, 538 (6th Cir. 2006)(citing *Butner,* 440 U.S. at 55)("Unless a federal interest is at issue, property rights are defined by state law.").

## C. Michigan law on fixtures

Under Michigan common law,[23] items of property that are fixtures are treated as part of the real estate, and are deemed transferred as part of a transfer of the real estate, except to the

---

[22] Presumably, Debtors rely on the $4,000.00 exemption that they each claimed for household goods and furnishings under 11 U.S.C. § 522(d)(3). (*See* Docket # 93 at 5, 6.) No one has objected to these particular claimed exemptions.

[23] The parties have cited one Michigan statute that defines "fixtures," but they do not argue that it applies in this case. The word "fixtures," as used in Article 9 of Michigan's Uniform Commercial Code, means "goods that have become so related to particular real property that an interest in them arises under real property law." Mich. Comp. Laws Ann. § 440.9102(1)(oo). No party argues that Article 9 applies to this dispute. And this Article 9 definition of "fixtures" gives no guidance to courts that must determine whether a particular item of property is a "fixture." Rather, the issue is one of "real property law," rather than one under the Uniform Commercial Code.

extent the transfer parties expressly agree otherwise. *See, e.g., Tyler v. Hayward*, 209 N.W. 801

(Mich. 1926). The Michigan Supreme Court thoroughly discussed the law concerning what is a

fixture in *Wayne County v. William G. Britton and Virginia M. Britton Trust*, 563 N.W.2d 674

(Mich. 1997)("*Britton Trust*"). The court described the concept in this way:

> "[T]he term 'fixture' necessarily implies something having a
> possible existence apart from realty, but which may, by annexation,
> be assimilated into realty." *Kent Storage Co. v. Grand Rapids
> Lumber Co.,* 239 Mich. 161, 164, 214 N.W. 111 (1927).

563 N.W.2d at 678. The *Britton Trust* court set out three requirements that must be met in order

for an item to be deemed a fixture:

> We reaffirm the three-part test enumerated in *Morris v. Alexander,*
> 208 Mich. 387, 175 N.W. 264 (1919), for determining what
> constitutes a fixture. Property is a fixture if (1) it is annexed to the
> realty, whether the annexation is actual or constructive; (2) its
> adaptation or application to the realty being used is appropriate;
> and (3) there is an intention to make the property a permanent
> accession to the realty.

*Id.* at 676. The court then elaborated on each part of this three-part test. It discussed the first

part, annexation to realty, and the concept of *constructive* annexation, at length:

### 1. Annexation to realty

> Annexation refers to
>
> the act of attaching or affixing personal property to
> real property and, as a general proposition, an object
> will not acquire the status of a fixture unless it is in
> some manner or means, albeit slight, attached or
> affixed, either actually or constructively, to the
> realty. That is, if the object is not attached to the
> land or to some structure or appliance which is
> attached to it, it will retain its character as
> personalty even though intended for permanent use
> on the premises. [35 Am. Jur. 2d, Fixtures, § 5, p.

9

703.]

If an object is not physically affixed to the realty, it may acquire the status of a fixture by constructive annexation. *Id.,* § 11, p. 707. This Court first addressed constructive annexation in *Colton v. Michigan Lafayette Building Co.,* 267 Mich. 122, 255 N.W. 433 (1934). In *Colton,* Lafayette subleased from Shelby Land Company realty on which Lafayette erected an office building. After Lafayette defaulted, it surrendered possession of the building to Shelby and assigned to it all subleases with tenants in the building. Lafayette subsequently sought to recover from Shelby certain property it left in the building. This property included articles such as:

> [1.] repair parts to elevator switchboard, elevator rugs, window shades, awnings, double doors and trim, base and shoe, red gum partitions, storm doors, elevator uniforms, window curtains, rubber matting, entrance mats, chain falls, Minneapolis thermostats and clock, wall case and mirror, [and] pump tanks for elevator [.] ... [2.] unused supplies ... such ... as paper towels, soap, paint, and electric light bulbs[;] ... used supplies and detached equipment such as pails, mops vacuum cleaners, ladders, electric grinder, drill press, etc. .... [*Id.* at 127, 255 N.W. 433.]

The issue before us was whether those articles were fixtures or personal property. Our focus was whether those articles were constructively annexed to the realty. We held that the first set of articles were fixtures because their removal from the realty would impair both their value and the value of the realty:

> These articles could not be removed from the building or transported from place to place without impairing their value as well as the value of the building. This building was erected for the purpose of renting stores and offices to the public and in order to be rentable must have various articles or accessories such as those listed above. [ *Id.*]

As to the second set of articles, we concluded that they were personal property, characterizing them as "ordinary movable office

10

furniture." *Id.*

We next addressed constructive annexation in *In re Slum Clearance,* 332 Mich. 485, 494-495, 52 N.W.2d 195 (1952), in which we considered whether the condemnee's molten metal and solutions, used in melting pots (a fixture) to create plates, were fixtures. The specific issue was whether the molten steel and solutions were constructively annexed to the realty (or to a fixture on the realty). Relying on *Colton, supra,* we concluded that the molten metal and solutions were constructively annexed to the melting pots (a fixture on the realty) because the molten metal and solutions were useless without the melting pots and the melting pots were useless without the molten steel and solutions:

> Under the circumstances of the instant case, the solutions and molten metal are trade fixtures, in the same category as the accessories and spare parts usable in connection with machinery but not actually affixed to the machinery or a part of land and buildings. The tanks are admittedly trade fixtures, but without the solutions they will not plate anything. The solutions are useless except for use in the plating tanks. They are used only in connection with the tanks, they are expressly made for the purpose and they are essential to the plating operation. The solutions are not sold and are not stocks of merchandise. We consider these solutions are analogous to the detached special parts of, or special tools for, a machine and like the machine (the tanks, in this instance) are constructively annexed to the freehold, and a part of the owner's trade fixtures. The same applies to the contents of the melting pots. This liquid metal is used only as part of the plating operation and is a trade fixture.

> The rationale used by this Court follows the approach used by other jurisdictions. We believe that the United States Court of Appeals for the Fifth Circuit succinctly stated the law of constructive annexation:

> "The doctrine of constructive annexation has frequently been applied in the case of articles which are not themselves actually or directly annexed to

11

the realty, but are part of, or accessory to, articles which are so annexed. Thus, where the principal part of the machinery is fixture due to actual annexation to the realty, the parts of it, although not actually annexed to the freehold, are fixture[s] where they would, if removed, leave the principal part unfit for use, and where of themselves they are not capable of general use elsewhere." [*Carmichall v. United States,* 273 F.2d 392, 395 (C.A.5, 1960), quoting 22 Am.Jur. 793, Fixtures, § 72.]

Hence, it is without dispute that Michigan, like other jurisdictions, recognizes the law of constructive annexation.

563 N.W. 2d at 678-80 (footnote omitted).

Next, the *Britton Trust* court discussed the second part of the fixtures test:

### 2. Adaptation to the use of the realty

No Michigan case has addressed the adaptation prong of the fixture test. The Wisconsin Supreme Court aptly defined adaptation as "the relationship between the chattel and the use which is made of the realty to which the chattel is annexed." *Premonstratensian Fathers v. Badger Mut. Ins. Co.,* 46 Wis.2d 362, 369, 175 N.W.2d 237 (1970) (storage coolers adapted to retail grocery store). The treatise, 35 Am. Jur. 2d, Fixtures, § 12, p.

[A]n object introduced onto the realty may become a fixture if it is a necessary or at least a useful adjunct to the realty, considering the purposes to which the latter is devoted.

We find these authorities informative and a useful guide in developing our jurisprudence in this area.

*Id.* at 680.

Finally, the court discussed the third part of the fixtures test:

### 3. Intention to make permanent accession to the realty

This Court examines the objective visible facts to determine

12

whether intention to make the article a permanent accession to the realty exists. *Continental Cablevision v. Roseville,* 430 Mich. 727, 736, 425 N.W.2d 53 (1988). The surrounding circumstances determine the intent of the party making the annexation, not the annexor's secret subjective intent. *Kent Storage Co, supra* at 165, 214 N.W. 111. Intent may be inferred from the nature of the article affixed, the purpose for which it was affixed, and the manner of annexation. 35 Am. Jur. 2d, Fixtures, § 15, p. 712; *American Telephone & Telegraph Co. v. Muller,* 299 F.Supp. 157, 159 (D.S.C., 1968); *State Hwy. & Transportation Comm'r v. Edwards Co., Inc.,* 220 Va. 90, 93-94, 255 S.E.2d 500, 503 (1979); *State Hwy. Comm. v. Empire Building Material Co.,* 17 Or.App. 616, 625, 523 P.2d 584 (1974).

*Id.* (footnotes omitted).

With regard to the third requirement, that there must have been an intent to make the property a permanent accession to the realty, the Court notes the following points. First, as the *Britton Trust* case quoted above suggests, mere testimony by an owner that he did not intend to make the property a permanent accession to the realty is immaterial in determining intent. Such an after-the-fact statement of subjective past intent cannot be considered. Under *Britton Trust,* only objective facts and circumstances may be considered in determining intent. *See also First Mortg. Bond Co. v. London*, 244 N.W. 203, 204 (Mich. 1932)(party's testimony of his "secret intention" is "immaterial"); *Michigan Nat'l Bank, Lansing v. City of Lansing*, 293 N.W.2d 626, 627 (Mich. Ct. App. 1980)("The intention which controls is that manifested by the objective, visible facts.").

Second, in determining whether the owner intended to make the property a **permanent** accession to the realty, permanence does not mean in perpetuity:

The permanence required is not equated with perpetuity. It is sufficient if the item is intended to remain where affixed until worn out, until the purpose to which the realty is devoted is

> accomplished or until the item is superseded by another item more
> suitable for the purpose.

*Michigan Nat'l Bank*, 293 N.W.2d at 627 (citation omitted).

Third, at least when the first two requirements for property to be a fixture are met

(annexation to the realty and adaptation to the realty,) parties to a real estate transfer may agree to

treat specific property as a fixture, and that agreement will satisfy the third (intent) requirement to

make the property a fixture. *See First Mortg. Bond Co.*, 244 N.W. at 204.

### D. Application of Michigan fixture law to this case

As noted in Part I-D of this opinion, the items in dispute in this case are these:

- window blinds
- window drapes and hardware
- refrigerator
- refrigerator door panels
- Electrolux dishwasher
- exterior garden bell
- wall mounted copper mailbox

The Court must consider whether each of these items satisfy the three requirements to make them

fixtures. This requires a detailed review of the evidence and the arguments of the parties.

### 1. Requirement no. 1: annexation to the real estate

In their brief and in oral argument during the April 20 hearing, Debtors conceded that all

of the items at issue, except the mailbox and the window blinds, were annexed to the real estate,

because they were attached in some way to the home.[24] The items were annexed to the real

estate, because they were physically attached to the home, in the following ways:

- **window drapes and hardware**: these were attached to the interior room walls of the

---

[24] Debtors' Supplemental Br. (Docket # 140) at 4.

14

home. As Debtors put it in their brief, "[The] [d]rapes [were attached] via Velcro and [the h]ardware [was attached] via screws and/or nails;"[25] and as Debtors put it in their affidavits, the drapes "were not hung with rods. The curtains were secured on wood platforms by Velcro[.]"[26] This attachment by Velcro is sufficient to constitute actual annexation to the realty, because even a "slight" attachment is sufficient. *See Britton Trust*, 563 N.W.2d at 678 (quoted in Part III-C of this opinion).

• **refrigerator**: other than by plugging the electric cord into the wall socket, the refrigerator was attached to the home only by a copper tube, connecting the home's water supply to an icemaker in the refrigerator.[27] This is sufficient to constitute actual annexation to the realty; as noted above, even a "slight" attachment is sufficient.

• **Refrigerator door panels**: these panels were attached to the refrigerator doors, to match the cabinetry in the kitchen.[28] These were annexed to the realty because they were attached to the refrigerator, which itself was attached to the home, as described above. *See Britton Trust*, 563 N.W.2d at 678 (attachment to an "appliance" that is attached to a structure on the land is sufficient to establish annexation to the realty).

• **Electrolux dishwasher**: the dishwasher was placed on the kitchen floor, "slid into a 'cove' into the cabinetry." Above it was part of the kitchen counter. The dishwasher was

---

[25] *Id.*

[26] Decl. of Thomas J. Joseph (Docket # 140, Ex. 1) at ¶ 34. The Declaration of Debtor Ann Joseph simply adopted by reference everything stated in Thomas Joseph's Declaration. (Decl. of Ann Marie Joseph (Docket # 140, Ex. 2) at ¶ 3.)

[27] Thomas Joseph Decl. (Docket # 140, Ex. 1) at ¶ 15.

[28] *See id.* at ¶ 14.

15

held in place to the underside of the kitchen counter top by an adhesive material "until it wore out." Debtors say "the adhesive often deteriorated." The dishwasher was connected to the home's water supply and sewage disposal line.[29]

• **exterior garden bell**: this was "a bell and clapper attached to a rope," which was "screwed to a post outside."[30] As the Gruits describe it, "The garden bell was on a post attached to the house next to the front door."[31] While Debtors say that this was decorative only and not intended to be a doorbell, they also admit that other than this, the home had no doorbell.[32]

Unlike the above items, which Debtors concede were annexed to the real estate, Debtors argue that the mailbox and the window blinds were not annexed to the realty. According to Debtors, the mailbox was not attached to the outside wall of the house; rather, it was "simply hung on two screws similar to how a picture hangs on a wall."[33] And, Debtors say, the window blinds were not themselves attached to the walls or window frames. Rather, Debtors say that "[t]he blinds hung from traditional end piece brackets and [were] not attached to any portion of the Residence. Only the brackets were screwed to the window frame or trim."[34]

The Court must reject Debtors' arguments. The manner in which the mailbox was hung

---

[29] *Id.* at ¶ 22.

[30] *Id.* at ¶¶ 24, 26.

[31] Decl. of Harry Gruits (Docket # 149, Ex. D) at ¶ 31.

[32] Thomas Joseph Decl. (Docket # 140, Ex. 1) at ¶ 24.

[33] *Id.* at ¶ 28.

[34] *Id.* at ¶ 33.

onto the outside wall of the house — resting on screws that were attached to the structure — is sufficient to constitute annexation to the realty. Any affixing of the mailbox to the real estate, however slight, is sufficient. In the words quoted with approval by the Michigan Supreme Court in *Britton Trust*, 563 N.W.2d at 678, the mailbox was annexed to the realty because it was "in some manner or means, albeit slight, attached or affixed" to the house.

The window blinds also were annexed to the realty. Debtors admit that the brackets from which the blinds hung "were screwed into the window frame or trim." The brackets, then, certainly were attached to the house, and therefore annexed to the realty. Thus, the hanging of the blinds on the brackets is like the hanging of the mailbox on the screws attached to the wall — the blinds were "in some manner or means, albeit slight, attached or affixed" to the house, and therefore were annexed to the realty. In addition, the window blinds and their brackets were a single unit for purposes of this analysis. To the extent Debtors argue otherwise, in the Court's view, they are splitting hairs. And the unity of the brackets and the blinds is confirmed by the fact that the Debtors removed and took the brackets along with the blinds that hung from them.[35]

Even if the Court could view the window blinds as not being *actually* annexed to the realty, the Court would find that the blinds were *constructively* annexed to the realty. In the words quoted with approval by the Michigan Supreme Court in *Britton Trust*, constructive annexation occurs with "articles which are not themselves actually or directly annexed to the realty, but are part of, or accessory to, articles which are so annexed." *Britton Trust*, 563 N.W.2d at 680 (quoting *Carmichall v. United States*, 273 F.2d 392, 395 (5th Cir. 1960)). In this case, the

---

[35] This is shown by the Declaration of Harry Gruits (Docket # 149, Ex. D) at ¶¶ 27-29 and by photographs included in Exhibit C to the Gruits's supplemental brief (Docket # 149, at pdf pp. 69-71). Nothing in the Debtors' Declarations contradict this.

17

window blinds were "accessory to" the brackets that held them. And the window blinds were not unlike the "elevator rugs, window shades, awnings, . . . storm doors, . . . window curtains," and other items found to be fixtures in *Colton v. Michigan Lafayette Bldg. Co.*, discussed in the *Britton Trust* case, 563 N.W.2d at 679. Removal of the blinds from the brackets would render the brackets useless, and "would impair both [the] value [of the blinds] and the value of the realty." *See id.* At a minimum, then, the blinds in this case were constructively annexed to the realty.

For these reasons, the Court must conclude that all of the items at issue were annexed to the real estate.

### 2. Requirement no. 2: adaptation to the use of the realty

Under *Britton Trust*, the second requirement for an item to be a fixture is that "its adaptation or application to the realty being used is appropriate." 563 N.W.2d at 676. Put another way, the item must be "a necessary or at least a useful adjunct to the realty, considering the purposes to which the latter is devoted." *Id.* at 680. All of the items at issue in these case easily meet this requirement.

Debtors correctly concede that the following items meet this requirement, because they were "adapted to the use of the real estate" and "either 'necessary' or 'useful' for the intended purpose of the real estate, namely a residence:"[36]

- window blinds
- refrigerator
- Electrolux dishwasher
- wall mounted copper mailbox

---

[36] Debtors' Supplemental Br. (Docket # 140) at 5.

18

Debtors argue that the remaining items, namely:

- window drapes and hardware
- refrigerator door panels
- exterior garden bell

do not meet the adaptation element of the fixtures test. This is so, Debtors argue, because the only purpose of these items was "one of aesthetics and decoration."[37] The window drapes and related hardware were only decorative, Debtors say, because the house already had the blinds in the windows to serve the purposes of providing privacy and blocking outside light. And Debtors say that the exterior garden bell was only for decoration; it was not intended to be a functioning doorbell (although Debtors admit that the home had no other doorbell.) And the refrigerator panels were only decorative — intended to match the kitchen cupboards.

The Court must reject Debtors' arguments. The fact that an item annexed to the realty served only a purpose of "aesthetics and decoration" does not mean that the item was not "useful" to the realty's use as a residence. To the contrary, items that help make a home aesthetically pleasing certainly serve a useful purpose. Such items are appropriately adapted to the realty's use as a residence, within the meaning of the *Britton Trust* test. Debtors cite no authority that holds or suggests otherwise, and at oral argument, Debtors' counsel conceded that he is not aware of any such authority.

The Court concludes that all of the items at issue meet the second (adaptation) requirement of the *Britton Trust* fixtures test.

---

[37] *Id.*

19

**3. Requirement no. 3: "objective, visible facts" showing an "intention to make the [item(s)] a permanent accession to the realty"**

This element of the fixtures test requires the Court to determine whether the party making the annexation to realty, in this case the Debtors, intended to make the items at issue permanent accessions to the realty. As discussed in Part III-C of this opinion, the Debtors' intention must be determined from the "objective visible facts," and the "surrounding circumstances," and not from any present statement by the Debtors of their past subjective intent. And the Debtors' intent may be inferred "from the nature of the article affixed, the purpose for which it was affixed, and the manner of annexation." *Britton Trust*, 563 N.W.2d at 680 (citations omitted).

The Debtors state in their Declarations that when they affixed each disputed item to the 191 Baldwin Road home, they intended the item to be a "non-permanent" item, which they could take with them when and if they moved from the home.[38] As discussed above, however, and as Debtors' counsel conceded at oral argument, such statements by the Debtors of their subjective past intent are immaterial under Michigan law; they cannot be considered as evidence supporting Debtors' position.

As evidence in support of Debtors' asserted intent, Debtors first point to the fact that they actually removed the disputed items from the 191 Baldwin property when they moved, after the sale to the Gruits had closed. Debtors argue that this tends to show that, at least by that time, the Debtors did believe and intend the items to be "non-permanent" attachments to the real estate, which they could remove. Similarly, Debtors assert that by the time of the Gruits's pre-closing inspection of the home on December 30, 2010, the Debtors had removed the window blinds from

---

[38] *See* Thomas Joseph Decl. (Docket # 140, Ex. 1) at ¶¶ 18, 23, 27, 30, 37.

the dining room of the home, and had removed the garden bell.[39] According to Debtors, this too tends to show that Debtors believed and intended these items to be "non-permanent" attachments to the real estate, which they could remove.

There are at least two problems with these arguments. First, evidence about what Debtors may have believed and intended in December 2010 and January 2011 has no probative value in trying to show what Debtors believed and intended *several years earlier*, when they affixed the disputed items to the 191 Baldwin property. Debtors affixed the items to the home in 1997, 2006, and early 2009.[40] The fact that Debtors removed those items from the home several years later, when the home was sold against their will and they were forced to move out, shows nothing more than the fact that the Debtors *wanted to keep* these items. Essentially, the arguments are that because Debtors removed certain items from the home, they must have had a right to do so.

Second, even if the Debtors' recent removal of the items could be considered probative of their intent about permanence when Debtors installed the items several years ago, there is evidence refuting Debtors' assertions of their recent intent. As discussed in Part I-A of this opinion, it was clear to Debtors and their attorney, at least as early as November 23, 2010 when the Trustee filed her Sale Motion, that the Trustee was proposing to sell the disputed items to the Gruits as part of her proposed sale of the 191 Baldwin home. The Trustee's Sale Motion sought

---

[39] *Id*. at ¶¶ 7-8. The Gruits dispute this, and point to pictures that they say disprove Debtors' assertions about the window blinds in the dining room. *See* Harry Gruits Decl. (Docket # 149, Ex. D) at ¶¶ 14-16, and Docket # 149 at pdf. p. 22. The Court concludes that it is not necessary to resolve this apparent factual dispute, given the Court's other findings and conclusions about the Debtors' intent.

[40] Thomas Joseph Decl. (Docket # 140, Ex. 1) at ¶¶ 14, 18 (refrigerator purchased and installed in 1997); 20, 23 (dishwasher purchased and installed in early 2009); 25 (garden bell 1997 or earlier – it was acquired before Debtors moved into the home); 28 (mailbox installed in 1997); 31, 32 (window blinds installed in 1997 and May 2006). Debtors did not say when the drapes and related hardware were installed. *See id.* at ¶¶ 34-38.

authority from the Court to sell the Baldwin property to the Gruits "according to the terms set forth" in the Purchase Agreement attached to the Sale Motion.[41]  That attached Purchase Agreement included, as items to be sold with the Baldwin property, all "built-in appliances, . . . window shades, shutters, blinds, curtains and drapery rods, and all window treatments, . . . and mailboxes," but not "free standing appliances."[42]

Debtors are represented by competent and assertive counsel in this bankruptcy case.  With the help of their counsel, Debtors have left virtually no stone unturned in litigating numerous disputes that have arisen in this case.  As noted in Part I-A of this opinion, Debtors objected to the Sale Motion on several grounds.  But they did not object to any of the terms of the Purchase Agreement, except to argue that the price was too low.  They did *not* object, for example, to the sale of any of the items now in dispute, on the ground that the Trustee was trying to sell exempt personal property that the Debtors had a right to take with them when they moved from the home. This omission by Debtors tends to show that in November and December 2010, at least, Debtors did *not* believe and intend that the disputed items were "non-permanent" parts of the real estate, that they could remove and keep if the real estate was sold.[43]

Debtors actually try to garner support for their position from the fact that the Purchase Agreement between the Gruits and the Trustee stated that certain of the disputed items were to be

---

[41]  Docket # 106 at 2, 3 (proposed order), Ex. A.

[42]  Docket # 106, Ex. A at 1.

[43]  When the objections to the Trustee's Sale Motion were settled, including Debtors' objections, the terms of that settlement were reflected in the December 21, 2010 Sale Order.  That Sale Order did not say that any of the disputed items were not to be sold as part of the Trustee's sale of the 191 Baldwin real estate, or that the Debtors could remove and keep any of those items.  Nor did Debtors' counsel raise this issue in the discussion of the settlement terms that occurred on the record during the December 20, 2010 hearing on the Sale Motion.

sold with the real property — *i.e.*, all "built-in appliances, . . . window shades, shutters, blinds, curtains and drapery rods, and all window treatments, . . . and mailboxes." Debtors argue that this is evidence of an intent that the items were not part of the real estate, and therefore could not be fixtures — otherwise, Debtors argue, there would have been no need to list the items separately as being sold with the real estate.

This argument is without merit, for at least two reasons. First, as Debtors have pointed out, the Purchase Agreement was, at most, an agreement between the Gruits and the Trustee. The Debtors were not parties to that agreement. As a result, the language Debtors point to in the Purchase Agreement indicates nothing about what the *Debtors'* intent was when they installed the items in the home. Under Michigan law, it is only the Debtors' intent, not the intent of the Gruits or the Trustee, that matters in this context.

Second, even if the Purchase Agreement could be taken to indicate anything about the *Debtors'* intentions, the language Debtors point to does not indicate an intention or agreement by *anyone* about whether the listed items were fixtures. The language obviously was intended merely to try to obtain certainty, and avoid a possible dispute and litigation after the closing, over whether the listed items were or were not part of the realty being sold. This is clear from the fact that the Purchase Agreement also listed many other items separately, as being sold with the 191 Baldwin property, that clearly were fixtures or otherwise part of the real estate. The agreement stated, for example, that "[t]he property includes all buildings; . . . plumbing, heating, and electrical fixtures; . . . water pumps and pressure tanks; . . . attached fireplace doors and screens; garage door opener and controls; . . . storm windows and doors; . . .[and] landscaping."[44]

---

[44] Docket # 106, Ex. A at 1.

Under Michigan law, the probative evidence on Debtors' intent is the "objective visible" evidence concerning "the nature of the article affixed, the purpose for which it was affixed, and the manner of annexation." *Britton Trust*, 563 N.W.2d at 680 (citations omitted). The Court will now consider each of these intent factors, for each item:

> • **window blinds:** the window blinds were white, wooden blinds, located in several rooms in this house, and were "hung from traditional end piece brackets" that were "screwed to the window frame or trim."[45] Numerous color photographs of the blinds, taken before they were removed, are in the record.[46] Their obvious purposes were (1) when desired, to block or reduce light from the outside; (2) to provide privacy to those inside the home, particularly after dark; and (3) to compliment and enhance the visual appeal of the white window frames. The white color of the blinds obviously was designed to match the white color of the window frames, rather than the color of any particular furniture or other personal property in the rooms. And the blinds were obviously custom-sized to each of the windows, which were of several different shapes and sizes.[47]

Based on the nature and purposes of the window blinds, and the way in which they were annexed to the home, the Court finds that when Debtors installed the blinds, they intended to make them a permanent accession to the real estate.

> • **window drapes and hardware**: the window drapes were hung on several windows, located in at least two rooms of the house, all on windows that also had blinds. Color

---

[45] Thomas Joseph Decl. (Docket # 140, Ex. 1) at ¶ 33.

[46] Docket # 149 at pdf. pp. 52-53, 55-68.

[47] *See* Harry Gruits Decl. (Docket # 149, Ex. D) at ¶ 30.

photographs of the drapes, before they were removed, are in the record.[48] The undisputed

evidence is that the drapes "were not hung with rods. The [drapes] were secured on wood

platforms by Velcro." The wood platforms, in turn, were attached to the walls by "screws

and/or nails."[49] The obvious purpose of the drapes was purely decorative. The drapes

were not for the purpose of blocking outside light or enhancing privacy; only the window

blinds had and served those purposes. It is obvious from the photographs that, as Debtors

state, the colors of the drapes were designed primarily to match the Debtors' furniture in

the rooms, although the drapes also were designed to compliment the color of the walls in

each room.

Thus, the drapes were rather easily removable, and designed primarily to go with Debtors'

furniture, which are items of personal property that Debtors obviously could and would take with

them when they moved from the home. Based on the nature and purpose of the drapes, and the

way in which they were annexed to the home, the Court finds that when Debtors installed the

drapes, they did *not* intend to make them a permanent accession to the real estate.

- **refrigerator and refrigerator door panels**: other than by plugging the electric cord

  into the wall socket, the refrigerator was attached to the home by a copper tube,

  connecting the home's water supply to an icemaker in the refrigerator.[50] The refrigerator

---

[48] Docket # 149 at pdf pp. 53, 56, 59-60, 62-63.

[49] *See* Thomas Joseph Decl. (Docket # 140, Ex. 1) at ¶ 34; Debtors' Supplemental Br. (Docket # 140) at 4.

[50] Thomas Joseph Decl. (Docket # 140, Ex. 1) at ¶ 15.

door panels were attached to the refrigerator doors, to match the cabinetry in the kitchen.[51] The refrigerator was not just a place to store and preserve food. It was also designed to blend with, and appear to be part of, the kitchen cabinetry (which cabinetry was attached to and part of the real estate). According to Debtors, the refrigerator "sat in a 'cove' in the [kitchen] cabinets, with approximately a 3 inch gap between it and the cabinet above."[52] The evidence, from Harry Gruits, is undisputed that the refrigerator "matched all the cabinetry in the kitchen," and "[t]he space in the cabinets that the refrigerator was in was trimmed out to create the appearance that the refrigerator was a permanent part of the kitchen."[53]

Based on the nature and purposes of the refrigerator and refrigerator door panels, and the way in which they were annexed to the home, the Court finds that when Debtors installed the refrigerator and refrigerator door panels, they intended to make them a permanent accession to the real estate. This concept of "permanence," when speaking of an appliance that eventually will wear out and have to be replaced, simply means that the item was "intended to remain where affixed until worn out." *See Michigan Nat'l Bank, Lansing*, 293 N.W.2d at 627 (quoted in Part III-C of this opinion).

• **Electrolux dishwasher**: the dishwasher did not have wheels, and so was not easily portable. It was placed on the kitchen floor, and "slid into a 'cove' into the cabinetry." Above it was the kitchen counter. The dishwasher was held in place to the underside of

---

[51] *See id.* at ¶ 14.

[52] *Id.* at ¶ 16.

[53] Harry Gruits Decl. (Docket # 149, Ex. D) at ¶ 24, 26.

the kitchen counter top by an adhesive material (which adhesive, Debtors say, "often deteriorated"); and it was connected to the home's water supply and sewage disposal line.[54]  There is a color photograph of the dishwasher in the record.[55]  Even though the dishwasher's black color did not match the white color of the kitchen cabinets that appear on either side of it, the dishwasher clearly appeared to be built into and part of the cabinetry, and that appearance obviously was intended.  From the photograph, there appears to be no space between the bottom, sides and top of the dishwasher on the one hand, and the kitchen floor, cabinetry on either side, or counter above, on the other hand.[56]  The dishwasher sat in an island or peninsula in the kitchen, and the back of the dishwasher was completely concealed by white cabinetry material.[57]  And a color photograph of the space that the dishwasher occupied, taken after it had been removed, shows that the part of the wood floor beneath where the dishwasher sat is unfinished, and does not match the finished wooden floor of the kitchen.[58]

Based on the nature and purpose of the dishwasher, and the way in which it was annexed to the home, the Court finds that when Debtors installed the dishwasher, they intended to make it a permanent accession to the real estate.  That is, like the refrigerator and refrigerator panels discussed above, when the Debtors installed the dishwasher, they intended it to "remain where

---

[54]  Thomas Joseph Decl. (Docket # 140, Ex. 1) at ¶ 22.

[55]  Docket # 149 at pdf p. 54.

[56]  *Id.*

[57]  *See* Docket # 149 at pdf p. 26 (black and white copy of photo,) and pdf pp. 54 and 35 (color photos).

[58]  *Id.* at pdf p. 35.

27

affixed until worn out." *Michigan Nat'l Bank, Lansing*, 293 N.W.2d at 627.

- **exterior garden bell**: this was "a bell and clapper attached to a rope," which was "screwed to a post outside."[59]  As the Gruits describe it, "The garden bell was on a post attached to the house next to the front door."[60]  While Debtors say that this was decorative only and not intended to be a doorbell, they also admit that other than this, the home had no doorbell.[61]

Based on the nature and purpose of the garden bell, and the way in which it was annexed to the home, the Court finds that when Debtors installed the garden bell, they intended to make it a permanent accession to the real estate.

- **mailbox:** According to Debtors, the mailbox was not attached to the outside wall of the house, except that it was "simply hung on two screws similar to how a picture hangs on a wall."[62]  The mailbox was intended to, and actually did, function as a mail receptacle. Debtors admit that they used it to receive mail, including mail relating to Thomas Joseph's insurance business, which included "frequent large envelopes" mailed to him.[63]

Based on the nature and purpose of the mailbox, and taking into account the way in which it was annexed to the home, the Court finds that when Debtors installed the mailbox, they intended to make it a permanent accession to the real estate.

---

[59]  Thomas Joseph Decl. (Docket # 140, Ex. 1) at ¶¶ 24, 27.

[60]  Harry Gruits Decl. (Docket # 149, Ex. D) at ¶ 31.

[61]  Thomas Joseph Decl. (Docket # 140, Ex. 1) at ¶ 24.

[62]  *Id.* at ¶ 28.

[63]  *Id.* at ¶ 29.

28

### E. Conclusions regarding the items in dispute

Based on the foregoing discussion, the Court concludes that all of the disputed items were fixtures under Michigan law, except the window drapes and related hardware. Those were not fixtures because they did not meet the third, intent element of the "fixtures" test.

It follows that all of the disputed items except the window drapes and their hardware were part of the real estate, which the Trustee had a right to sell, and did sell, to the Gruits. Debtors had no right to remove those items when they moved from the home.[64]

It further follows that the Debtors failed to "surrender the premises in good order" as required by the Sale Order. The Court expresses no opinion, at this time, about whether or how the Debtors can remedy that failure, but it is clear that they have not remedied that failure to date. To date, therefore, the Trustee has had no duty to pay any part of the $25,000 exemption escrow to the Debtors under the Sale Order. The Debtors' Motion, which seeks such relief, must be denied.

The issues of whether and how Debtors can remedy their failure to surrender the premises in good order, and other issues concerning what is to be done with the $25,000 escrow, can and will be determined in the pending adversary proceeding, Case No. 11-4461.

---

[64] The Court rejects the Gruits' argument that the window drapes and related hardware must be considered fixtures because the Purchase Agreement said that the property being sold included all "curtain and drapery rods, and all window treatments." (Docket # 106, Ex. A at 1.) The Debtors are not bound by this language in the Purchase Agreement, which was, at most, an agreement between the Trustee and the Gruits. The Sale Order did not reference the Purchase Agreement, and cannot be taken to authorize the Trustee to sell any personal property of the Debtors. Under the Sale Order, the Trustee had authority to sell the window drapes and related hardware only if they were fixtures, and therefore part of the real estate.

29

## IV. Conclusion

For the reasons stated in this opinion, the Court will enter an order denying Debtors'

Motion.

**Signed on May 12, 2011**                    **/s/ Thomas J. Tucker**
                                              **Thomas J. Tucker**
                                              **United States Bankruptcy Judge**